PERCY W. HORTON and Others, Appellants, *v.* NIAGARA, LOCKPORT AND ONTARIO POWER COMPANY, Respondent. (Action No. 2.)

Fourth Department, January 21, 1931.

*Cobb, Cosgrove, Harter & Wright* [*Delos M. Cosgrove, Loren E. Harter* and *Allen S. Hubbard* of counsel], for the appellants.

*Purcell, Cullen & Reynolds* [*Francis E. Cullen, Henry W. Killeen, Warren Tubbs* and *Charles R. Sweeney* of counsel], for the respondent.

THOMPSON, J. Plaintiffs bring this action to establish their title to two certain pieces of land, one the bluff, so called, lying on the south bank of the Salmon river, and the other the gore, so called, which is part of an island lying in the river. The bluff is claimed by plaintiffs under a deed to their ancestor from the executors of William C. Pierrepont, deceased, and the gore is claimed by plaintiffs under a deed to their ancestor from the heirs of Blakeman. The bluff is a strip of land about thirteen and one-half chains long and extends from the river's high-water mark on the south bank to the top of such bank, while the gore is part of an island lying in the channel or between two channels of the river and a little upstream from the bluff. The ownership of the bluff depends on the location of the north line of the Thomas (defendant's) lot, which adjoins the lot of which plaintiffs claim the bluff is a part, on its south boundary. In all of the deeds of the Horton

(plaintiffs') lot, of which plaintiffs claim the bluff is a part, the south boundary is described as " the north line of the Thomas lot; " so that wherever the north line of the Thomas lot is found to be located there will be found the south line of the Horton lot, and this will determine the ownership of and title to the bluff.

To establish the location of this line, plaintiffs swore a surveyor-engineer, who testified to surveys made by him based upon his assumed correct location of two corner monuments. Starting from these monuments the surveyor first ran various lines and distances in accordance with the measurements and courses set up in the descriptions contained in the deed of the Thomas lot and the deed of a lot lying immediately west of and adjoining both the Thomas and the Horton lots, and he located the line in question practically where plaintiffs claim it to be, to wit, on the top of the bank. The witness then made several different surveys in an unsuccessful effort to confirm and check the location of the line as he had established it. In the making of these surveys he used other assumed monuments that he had found, and measurements and courses taken from descriptions in the deeds of the Thomas and Horton lots, and lots lying on both sides of the lines he projected. In one instance his check survey took him to a point thirty-nine links to the north of the line, as he had located it; in another to a point eighty links north of it, and in still another to a point thirty links south of it. Plaintiffs failed to adduce testimony of measurement, survey, ancient document or parol proof to support their surveyor in locating this line where he did. Plaintiffs also failed to introduce testimony to establish the placing or significance of the so-called monuments which the surveyor found and depended upon. The Thomas lot was the first lot conveyed out of great lot 89, so the location of its boundary lines would not depend upon the location of the boundary lines of the other parcels taken out of lot 89 by subsequent conveyances. There is no mention in the Thomas deed of the Salmon river or of any monuments, the description being solely by courses and distances. It should be noted that the map which plaintiffs' surveyor drew from his surveys, and which is in evidence, does not show the river. A significant fact established by the surveyor's testimony is that there is no more basis in fact for locating the line where he did than there is for locating it respectively thirty-nine or eighty links north or thirty links south of such location.

To meet this testimony defendant introduced two ancient maps, representing among other things the Horton and Thomas lots, and the river flowing between them. One map shows the north line of the Thomas lot, running diagonally across the river, to wit,

beginning at the point where the east line of the lot intersects the south shore line of the river; thence to the point where the west line of the lot meets the north shore line of the river. The other map showing the same lots and the river represents the north line of the Thomas lot in the center of the river. These two maps are extremely convincing. They show care and skill in drawing and appear to be based upon surveys. But plaintiffs claim they are incompetent and should not have been admitted in evidence.

The maker of the maps was William C. Pierrepont, who died in 1885. He was a skilled surveyor and the son of Hezekiah Pierrepont, deceased, who executed the Thomas deed. The older of the maps was part of a plot book which was started in 1820 and completed in 1854. The other was copied from the first into a plot book made up in 1854. Both plot books were deposited in the Pierrepont Manor land office, of which, with its contents, Hezekiah Pierrepont, deceased, William C. Pierrepont, deceased, William M. White, deceased (husband of a daughter of William C. Pierrepont), and the witness Hugh White (son of William M. White, and grandson of William C. Pierrepont), who produced the maps at the trial, were successively the owners and custodians. These plot books were made and kept for the purpose of providing an accurate and authentic record of the operations of a land development enterprise which at one time included 406,000 acres. The maps making up the plot books were made from surveys and showed the boundary lines, location and acreage of the various lots sold as they were deeded out, and were essential to the business of plotting and selling the lands of the development in order that accurate, reliable and sufficient information as to each lot sold and the lots or land remaining should be available at all times. Upon the portion of the older of the maps drawn to show the Thomas lot there are found notations made in the handwriting of William C. Pierrepont, deceased, accurately setting forth the name of the grantee, the acreage, date of the deed (June 11, 1838) and the distances and courses used to make up the description by which the lot was conveyed by Hezekiah Pierrepont to Thomas. This map also shows the courses and distances of the center of the river, as it runs entirely across great lot 89, and those given for so much of it as flows between the two lots here in suit conform exactly to the ones set forth in the Thomas deed as the north line of the lot it conveyed.

The proof abundantly establishes all of the prerequisites necessary to make these maps competent. The matter to be proved is ancient. The maps were executed by competent authority, were found in the proper depository and were produced from a proper

custody. (*Cravath* v. *Baylis, No. 1*, 113 App. Div. 666, 670; 5 Chamberlayne Ev. [1916] p. 4884; *Donohue* v. *Whitney*, 133 N. Y. 178; *Matter of Webster*, 106 App. Div. 365; *Morris* v. *The Lessee of Harmer's Heirs*, 7 Pet. 554; *People* v. *Denison*, 17 Wend. 312.)

At the most the testimony raises questions of fact as to the location of this line which the trial court has found in favor of defendant, and it cannot be said that such findings are contrary to the evidence.

There remains the question of the ownership of the gore, which the court has found to be in defendant. The determining factor in this title is whether the land is included in or excluded by certain terms of the Blakeman deed under which plaintiffs claim, which read as follows: " all that part of the farm * * * which is covered by the waters of Salmon River *in the several channels thereof up to high water mark of the respective channels, whether the said channels now be dry or not.*" It is conceded that the lands lie within the channel or channels of the Salmon river. Neither side attempted to prove the exact elevation of the river's high-water mark or vegetation line. It appears that the land in the gore was wooded; that it lay above the bed of the river, although not very far above, contained timber and thicket growth of all descriptions ranging from mere bushes up to good sized trees, and that fallen logs were seen upon it. The court has found that these lands lie above the high-water mark of the river, and it cannot be said that support for such a conclusion is not to be found in the evidence. The court properly construed the conveyance and arrived at the fair intent of the parties. The determination that the ownership of the gore is not in the plaintiffs is sustained both in fact and law.

The case presented various questions of fact which the trial court has decided, and we are unable to say that such determinations are not sustained by the evidence. The case was tried fairly, and our attention has not been called to any error which should lead to a reversal of the judgment.

The judgment should be affirmed, with costs.

All concur. Present — CROUCH, TAYLOR, EDGCOMB, THOMPSON and CROSBY, JJ.

Judgment affirmed, with costs.